[Cite as *State ex rel. Randstad N. Am., Inc. v. Bullard*, 2024-Ohio-3169.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Randstad North America, Inc., :

      Relator, : No. 22AP-688

v. : (REGULAR CALENDAR)

Andrew J. Bullard et al., :

      Respondents. :

---

D E C I S I O N

Rendered on August 20, 2024

---

**On brief:** *Lori A. Whitten Law, LLC*, and *Lori A. Whitten*, for relator.

**On brief:** *Flint and Kilbride LLP*, and *Christopher A. Flint*, for respondent Andrew J. Bullard.

**On brief:** *Dave Yost*, Attorney General, and *John R. Smart*, for respondent Industrial Commission of Ohio.

---

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

EDELSTEIN, J.

{¶ 1} Respondent, the Industrial Commission of Ohio ("commission"), awarded respondent, Andrew J. Bullard, scheduled-loss compensation under R.C. 4123.57(B) for the permanent and total loss of functional use of his left foot due to partial amputation following an industrial accident. Mr. Bullard's employer, relator Randstad North America, Inc. ("Randstad"), now seeks a writ of mandamus from this court directing the commission to vacate its order because, it contends, the commission's order awarding loss-of-use compensation was not sufficiently supported by evidence or otherwise was issued in error.

{¶ 2} Because the commission's order is supported by some evidence and we do not find the commission abused its discretion in awarding Mr. Bullard loss-of-use compensation, we deny the requested writ.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 3} On September 24, 2021, Mr. Bullard was working for Randstad when his left foot was run over and crushed by a forklift. (Stip. Evid. at 1, 19-20.) The following day, Mr. Bullard was diagnosed in the emergency room with a "degloving injury to [his] left forefoot involving great toe, 2nd and 3rd toes," and underwent an amputation of his great toe at the distal phalanx, his second toe at the metatarsophalangeal joint, and his third toe at the base proximal phalanx. (Stip. Evid. at 10-11.) The attending orthopedic surgeon, Sanjay Mehta, M.D., advised Mr. Bullard that "[i]n degloving injuries and crushing injuries, the zone of injury is not clear and could extend proximally" even following amputation. (*See* Stip. Evid. at 11.) Dr. Mehta also warned that necrosis—death of the cells in body tissues—could extend more proximally, which could require further amputation. (*See* Stip. Evid. at 11.)

{¶ 4} Indeed, on October 13, 2021, Mr. Bullard presented for emergency medical care with complaints of worsening pain in his left foot and posterior calf despite taking the prescribed pain medications. (*See* Stip. Evid. at 49-54.) Examination and imaging revealed a "significant degree of necrotic skin" and elevated inflammatory markers, suggesting infection. (Stip. Evid. at 51-52.) Wet gangrene—dead tissue caused by lack of blood flow with bacterial infection—was observed in Mr. Bullard's first metatarsal bone, in the soft tissue areas where his second and third toes had been removed, and in the distal phalange bones of the remaining fourth and fifth toes. (*See* Stip. Evid. at 12, 24-25, 50-54.)

{¶ 5} In light of these post-operative complications, Mr. Bullard underwent a Lisfranc amputation (a disarticulation at the level of the tarsometatarsal joints) of his left foot on October 19, 2021. (Stip. Evid. at 12-13, 24-25, 44, 52.) During that surgery, orthopedic surgeon Corey Lee Van Hoff, M.D., also removed the base of the fourth metatarsal bone, which he noted would possibly make the foot slightly more unstable. (Stip. Evid. at 13.) Dr. Van Hoff left the base of the fifth metatarsal bone attached for a peroneus brevis insertion, but, because of concern for infection in the distal aspect of the foot that had been removed, elected not to add an Achilles tendon lengthening at that time. (Stip. Evid. at 12-13.)

{¶ 6}  Mr. Bullard underwent a third surgery on October 25, 2021 to remove additional necrotic tissue found following signs of infection and bloody incisional drainage from what remained of his left foot.  (Stip. Evid. at 14-15, 25, 54-55.)  During that surgery, Dr. Van Hoff collected surgical cultures showing E. Faecalis and Staphylococcus simulans bacteria.  (Stip. Evid. at 25.)  Following surgery, Mr. Bullard underwent a six-week course of intravenous daptomycin antibiotics.  (Stip. Evid. at 24-28.)  The peripherally inserted central catheter was removed on December 6, 2021, at which time the attending infectious diseases provider noted that Mr. Bullard's inflammatory markers were "trending down appropriately" and his incision site was healing well.  (Stip. Evid. at 24-27, 56.)

### A. Workers' Compensation Proceedings Before the Commission

{¶ 7}  Mr. Bullard completed the first report of injury on September 30, 2021 and submitted his C-84 form requesting temporary total compensation for his temporary total disability ("TTD").  (Stip. Evid. at 1, 109.)  However, because Randstad, a self-insured employer, was already paying Mr. Bullard TTD compensation, commencing September 25, 2021 and continuing, and had certified Mr. Bullard's workers' compensation claim for the conditions of "crush injury left foot and fractures toes left foot" on October 26, 2021 (*see* Stip. Evid. 8-9), a District Hearing Officer ("DHO") of the commission issued an order on February 5, 2022 dismissing Mr. Bullard's TTD compensation request as moot.  (*See* Stip. Evid. at 109-10.)  Nothing in the record before us suggests Randstad has stopped paying TTD compensation to Mr. Bullard or has otherwise requested that the commission modify its obligation to make such payments.

{¶ 8}  Because he underwent two additional amputation surgeries after his initial workers' compensation claim documents were filed, Mr. Bullard filed a C-86 motion on December 29, 2021 requesting three new conditions be added to his workers' compensation claim: left foot amputation, left foot crush injury complicated by infection, and degloving injury to left forefoot.  (Stip. Evid. at 18.)  In that same motion, Mr. Bullard also requested scheduled-loss compensation under R.C. 4123.57(B) for the amputation of—or, alternatively, loss of use of—his left foot.  (Stip. Evid. at 18.  *See also* Mar. 1, 2023 Brief of Industrial Commission at 8, citing Jan. 23, 2023 Brief of Randstad at 4.)  In support of his C-86 motion, Mr. Bullard identified the operative reports of Dr. Mehta and Dr. Van Hoff,

as well as the December 6, 2021 progress note from his follow-up appointment with his infectious diseases provider. (Stip. Evid. at 18.)

{¶ 9}   David L. Louis, M.D., an independent medical examiner specializing in occupational medicine, examined Mr. Bullard at Randstad's request on March 2, 2022. (*See* Stip. Evid. at 42-43.)  In his corresponding report, Dr. Louis opined that the conditions of "left foot crush injury complicated by infection" and "degloving injury to left forefoot" were directly caused by the workplace accident.  (Stip. Evid. at 57.)  However, Dr. Louis opined that, based on his review of medical records and examination of Mr. Bullard, Mr. Bullard has ***partial*** amputation of the left foot at the level below the metatarsals, such that the condition of "partial left foot amputation (Lisfranc amputation)"—but not "left foot amputation"—should be added to Mr. Bullard's workers' compensation claim.  (Stip. Evid. at 57-58.)  Dr. Louis further opined that because the medical record showed only a partial amputation of the left foot, Mr. Bullard had not sustained a total loss of that foot.[1]  (Stip. Evid. at 58.)

{¶ 10} In response to Dr. Louis's assessment, Dr. Van Hoff filed a causation statement with the commission on March 15, 2022 opining that "[a]s a direct result of Mr. Bullard's L[i]sfranc amputation procedure on 10-25-21, for all practical intents and purposes he has a ***total loss of use of his foot***." (Emphasis added.)  (Stip. Evid. at 59.) Photos were also submitted to the commission depicting what remained of Mr. Bullard's left foot following the three amputation surgeries.  (*See* Stip. Evid. at 28, 60-61.)

{¶ 11} A DHO of the commission conducted a hearing on Mr. Bullard's requested additional conditions and scheduled-loss claim on March 16, 2022.  (Stip. Evid. at 62-63.) At that hearing, Mr. Bullard conveyed he was requesting scheduled-loss compensation under R.C. 4123.57(B) by amputation and, in the alternative, for the functional loss of use of his left foot.  (*See* Brief of Commission at 8, citing Brief of Randstad at 4; Stip. Evid. at 62-63.) Of note, our review of what occurred at that hearing is limited because no transcript of that proceeding was filed.

---

[1] Although Dr. Louis's March 2, 2022 IME report opined that Mr. Bullard "does qualify for an amputation award for total loss of the left foot" (Stip. Evid. at 58), he clarified in his subsequently filed June 10, 2022 addendum report that this was a typographical error, as "the last line should have stated that he does not qualify for an amputation award for total loss of the left foot." (Emphasis sic.) (Stip. Evid. at 74.)

{¶ 12} Following the hearing, the DHO issued an order on March 25, 2022 additionally allowing the following conditions: "left foot crushing injury complicated by infection," "degloving injury to left fore foot [sic]," and "left foot *Lisfranc* amputation." (Emphasis added.) (Stip. Evid. at 62.) Although only allowing addition of the partial amputation condition to Mr. Bullard's workers' compensation claim, the DHO nonetheless found Mr. Bullard had "satisfied his burden of proving by a preponderance of the evidence that he has *lost the use* of his left foot to such a degree that the left foot is useless for all practical purposes and that his left foot, though partially present, is not capable of performing most of the functions which it commonly performs." (Emphasis added.) (Stip. Evid. at 62.) The DHO indicated his order was based on the medical records of Mr. Bullard's treating medical providers and found the beginning date for payment of the scheduled-loss award was October 19, 2021, when the Lisfranc amputation surgery was performed. (Stip. Evid. at 63.)

{¶ 13} Randstad appealed from the DHO's order awarding scheduled-loss compensation on March 28, 2022. (*See* Stip. Evid. at 65.) That appeal was heard by a Staff Hearing Officer ("SHO") of the commission on May 23, 2022. (Stip. Evid. at 71.) In addition to the evidence presented at the first hearing, Mr. Bullard submitted an April 5, 2022 medical report from Dr. Van Hoff noting that Mr. Bullard had considerable pain in his fifth metatarsal bone, which prevented him from wearing the prosthesis he obtained earlier that year. (Stip. Evid. at 68-69, 71-72. *See also* Stip. Evid. at 33-40.) As a result, Dr. Van Hoff opined that surgical excision of that bone and rerouting of Mr. Bullard's peroneal tendon was appropriate, and requested the Bureau of Workers' Compensation ("BWC") authorize this surgery on April 13, 2022. (Stip. Evid. at 67-72.) Although not known at the time of the May 2022 hearing, we note the BWC approved this surgery on August 2, 2022 (Stip. Evid. at 103), which was performed on September 2, 2022 (Stip. Evid. at 104). Significantly, it does not appear from the record before us that Randstad submitted any evidence contesting Dr. Van Hoff's functional loss-of-use opinion from March 15, 2022 or his April 2022 findings. Though, again, our review of what occurred at this May 2022 hearing is limited because a transcript of that proceeding was not filed in this case.

{¶ 14} On May 26, 2022, the SHO issued an order modifying the DHO order by providing additional explanation for awarding Mr. Bullard scheduled-loss compensation

under R.C. 4123.57(B). (Stip. Evid. at 71-72.) The SHO indicated his decision to approve payments of 150 weeks of compensation to Mr. Bullard for the "total loss of use of [Mr. Bullard's] left foot" was based on Dr. Van Hoff's March 15, 2022 report (Stip. Evid. at 59), photographs of Mr. Bullard's left foot (Stip. Evid. at 60-61), and Mr. Bullard's hearing testimony stating he is unable to walk on his left foot and "the only use he has of what remains of his left foot is to put weight on his left heel as he transfers onto his scooter." (Stip. Evid. at 71-72.) While noting Mr. Bullard's left foot "is not totally gone," the SHO found "this is the type of bare minimum remaining 'use' of an extremity * * * that the Ohio Supreme Court ruled in *State ex rel. Alcoa Bldg. Prods. v. Indus. Comm.*, 102 Ohio St.3d 341, [2004-Ohio-3166] does not bar the payment of a loss of use award." (Stip. Evid. at 72.) The SHO also referenced Dr. Van Hoff's April 2022 treatment records indicating Mr. Bullard will "undergo more surgery to remove even more of [his] foot[,] * * * [s]pecifically, his fifth metatarsal bone." (Stip. Evid. at 72, discussing Stip. Evid. at 68-69.)

{¶ 15} On June 13, 2022, Randstad appealed from the May 26, 2022 SHO order, arguing that because Mr. Bullard's left foot was only partially amputated and neither the DHO nor SHO found that Mr. Bullard's loss of use of his left foot was a permanent condition, their resulting orders contain mistakes of fact and law. (*See* Stip. Evid. at 76-81.) In support of its appeal requesting a third discretionary hearing by the commission on Mr. Bullard's request for scheduled-loss compensation, Randstad obtained and provided the commission with an addendum report from Dr. Louis, dated June 10, 2022, addressing the "permanent total loss of use of the left foot from a functional standpoint." (Stip. Evid. at 74-75.) In that report, Dr. Louis opined that Mr. Bullard "has not sustained a permanent total loss of use of the left foot from a functional standpoint" because, as a ***general*** matter, a Lisfranc amputation is "performed to preserve function" and ***typically*** "allows the foot to be used with a support in the shoe to facilitate gait." (Stip. Evid. at 75.)

{¶ 16} The commission refused Randstad's appeal by order issued on June 15, 2022 (Stip. Evid. at 93-94) and unanimously denied Randstad's July 1, 2022 request for reconsideration of that order (Stip. Evid. at 95-102) on August 10, 2022 (Stip. Evid. at 107-08). Randstad subsequently commenced this mandamus action on November 11, 2022.

**B. The Mandamus Action**

{¶ 17} In this case, Randstad seeks a writ directing the commission to vacate its May 2022 order and issue a new order denying Mr. Bullard's request for scheduled-loss compensation under R.C. 4123.57(B). Specifically, Randstad contends the commission's decision constituted an abuse of discretion because, for several reasons, the commission did not have "some evidence" to support its finding that Mr. Bullard sustained the permanent and total loss of functional use of his left foot. (*See* Nov. 11, 2022 Compl. at ¶ 13-14, 16-19.) Randstad also takes issue with the commission's refusal to grant a third hearing on the scheduled-loss award or reconsider its decision "when new evidence in the form of an addendum report from Randstad's IME doctor" was prepared on June 10, 2022 and submitted to the commission some weeks after the SHO rendered the May 26, 2022 decision with which Randstad takes issue. (*See* Nov. 11, 2022 Compl. at ¶ 15.)

{¶ 18} Pursuant to Civ.R. 53(C) and Loc.R. 13(M) of the Tenth District Court of Appeals, we referred this matter to a magistrate. After receiving briefing and stipulated evidence from the parties, the magistrate issued the appended decision on April 25, 2024, including findings of fact and conclusions of law, recommending that we grant Randstad's petition for a limited writ of mandamus and remand the matter to the commission for issuance of an order citing what evidence it relied upon in the record and briefly explaining its reasoning for finding Mr. Bullard's loss of use was permanent.

{¶ 19} The commission, Mr. Bullard, and Randstad each object to some of the magistrate's findings of fact and/or conclusions of law, as discussed in our analysis below. All objections were timely filed under Civ.R. 53(D)(3)(b). We must therefore independently review the objected to matters and evaluate whether "the magistrate has properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d).

## II. MANDAMUS STANDARD AND STANDARD OF REVIEW

{¶ 20} An order of the commission that grants or denies scheduled-loss compensation sought under R.C. 4123.57(B) concerns the extent of a claimant's disability and, as such, is not subject to appeal. *See, e.g.*, *State ex rel. Kroger Co. v. Stover*, 31 Ohio St.3d 229 (1987), paragraph one of the syllabus; R.C. 4123.512(A). Thus, such order must be challenged in a mandamus action. *See id.*

{¶ 21} Randstad is entitled to a writ of mandamus if it shows by clear and convincing evidence that it has a clear legal right to the requested relief, that the commission has a clear legal duty to provide that relief, and that it has no adequate remedy in the ordinary course of the law. *State ex rel. Ottinger v. B&B Wrecking & Excavating, Inc.*, ___ Ohio St.3d ___, 2024-Ohio-1656, ¶ 14, citing *State ex rel. Zarbana Indus. v. Indus. Comm.*, 166 Ohio St.3d 216, 2021-Ohio-3669, ¶ 10.

{¶ 22} A writ of mandamus may lie when there is a legal basis to compel the commission to perform its duties under the law or when the commission has abused its discretion in carrying out its duties. *Ottinger* at ¶ 16, citing *State ex rel. Gen. Motors Corp. v. Indus. Comm.*, 117 Ohio St.3d 480, 2008-Ohio-1593, ¶ 9. We are not required to defer to an administrative agency's interpretation of a statute enacted by the General Assembly or application of case law issued by Ohio courts. *See TWISM Ents., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, 172 Ohio St.3d 225, 2022-Ohio-4677, ¶ 3. However, we "will not order the commission to vacate its decision if the decision is supported by some evidence." *State ex rel. Neitzelt v. Indus. Comm.*, 160 Ohio St.3d 175, 2020-Ohio-1453, ¶ 23. Thus, " '[w]here a commission order is adequately explained and based on some evidence, even evidence that may be persuasively contradicted by other evidence of record, the order will not be disturbed as manifesting an abuse of discretion.' " *Ottinger* at ¶ 16, quoting *State ex rel. Mobley v. Indus. Comm.*, 78 Ohio St.3d 579, 584 (1997).

{¶ 23} "[A]buse of discretion connotes that the court's attitude is unreasonable, arbitrary or unconscionable." (Internal quotations omitted.) *State v. Weaver*, 171 Ohio St.3d 429, 2022-Ohio-4371, ¶ 24, quoting *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 60, quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). "A decision is unreasonable if there is no sound reasoning process that would support the decision." (Internal quotations omitted.) *Fernando v. Fernando*, 10th Dist. No. 16AP-788, 2017-Ohio-9323, ¶ 7, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). A decision is arbitrary if it is made "without consideration of or regard for facts [or] circumstances." (Internal quotations omitted.) *State v. Hill*, 171 Ohio St.3d 524, 2022-Ohio-4544, ¶ 9, quoting *State v. Beasley*, 152 Ohio St.3d 470, 2018-Ohio-16, ¶ 12, quoting *Black's Law Dictionary* 125 (10th Ed.2014). A

decision may also be arbitrary if it lacks any adequate determining principle and is not governed by any fixed rules or standards. *See Beasley* at ¶ 12, citing *Dayton ex rel. Scandrick v. McGee*, 67 Ohio St.2d 356, 359 (1981), quoting *Black's Law Dictionary* 96 (5th Ed.1979). *See also State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, ¶ 19. A decision is unconscionable if it "affronts the sense of justice, decency, or reasonableness." *Fernando* at ¶ 7, citing *Porter, Wright, Morris & Arthur, L.L.P. v. Frutta Del Mondo, Ltd.*, 10th Dist. No. 08AP-69, 2008-Ohio-3567, ¶ 11.

**{¶ 24}** An abuse of discretion may also be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, ¶ 15 (8th Dist.). *See also New Asian Super Mkt. v. Weng*, 10th Dist. No. 17AP-207, 2018-Ohio-1248, ¶ 16.

### III. ANALYSIS

**{¶ 25}** Randstad, the commission, and Mr. Bullard each object to various aspects of the magistrate's April 25, 2024 decision. In relevant part, the magistrate concluded that "the commission abused its discretion when it failed to specifically state what evidence it relied upon and explain its reasoning for its apparent conclusion that [Mr. Bullard's] loss of use was permanent." (Appended Mag.'s Decision at {¶ 89}.) Finding that "the issue of permanency is inextricably intertwined with [Randstad's] remaining arguments related to loss of use," the magistrate declined to address additional arguments raised by Randstad in support of the mandamus relief requested. (Appended Mag.'s Decision at {¶ 89}.) Instead, the magistrate recommended that we grant a limited writ of mandamus, return the matter to the commission "for a determination on permanency," and direct the commission to issue a written order citing "what evidence it relied upon in the record" and explaining "its reasoning for finding [Mr. Bullard's] loss of use was permanent." (Appended Mag.'s Decision at {¶ 89}-{¶ 90}.)

**{¶ 26}** Randstad does not object to the magistrate's factual findings or conclusions of law. Rather, Randstad takes issue with the magistrate's recommendation that we refer the matter back to the commission for a determination on the permanency issue because, Randstad contends, there is no evidence of permanency in the record and such remand would therefore be futile. (Randstad Obj. No. 1.) Randstad also broadly objects to the

magistrate's failure to address additional arguments raised in its mandamus complaint and supporting briefing.  (Randstad Obj. No. 2.)

**{¶ 27}** On the other hand, both Mr. Bullard and the commission dispute the magistrate's finding that the commission abused its discretion by not adequately citing to medical evidence showing Mr. Bullard's left foot amputation was a permanent condition, and by failing to sufficiently explain why it concluded the amputation was permanent. (Bullard Obj. No. 2; Commission Obj. No. 2.)  Respondents also contest the propriety of the magistrate's application of *State ex rel. Block v. Indus. Comm.*, 174 Ohio St.3d 175, 2023-Ohio-4184—which involved a claim for the loss of use of a ***fractured*** hand—in analyzing the permanency of Mr. Bullard's amputated limb.  (Bullard Obj. No. 1; Commission Obj. No. 2.)  Additionally, the commission takes issue with the magistrate's factual finding that, following his amputations, Mr. Bullard retained "part of the forefoot."  (Commission Objection No. 1, referencing Appended Mag.'s Decision at {¶ 61}.)

### A.  Review of Magistrate's Factual Findings

**{¶ 28}** At the outset, we note that neither Mr. Bullard nor Randstad contend that Mr. Bullard retained his forefoot following the Lisfranc amputation at the midfoot level. (*See* May 27, 2024 Randstad Reply to Objs. at 6.)  And, on review, we find no evidence in the record before us suggesting that he did.  (*Compare* Stip. Evid. at 24, 71.)  As such, the commission's first objection to the magistrate's decision is well-taken.

**{¶ 29}** The parties do not present any other objections to the magistrate's findings of fact.  Having reviewed the record and the magistrate's factual findings—and in the absence of any objection thereto—we find no error in the magistrate's determinations of the facts, except as otherwise specified herein.

### B.  Review of Magistrate's Substantive Legal Conclusions

**{¶ 30}** The parties' objections primarily concern the magistrate's analysis of the commission's finding that Mr. Bullard was entitled to compensation under R.C. 4123.57(B) for the permanent and total loss of use of his left foot following amputations.  At issue is whether an injured worker's loss of use of an amputated body part is an inherently permanent condition such that explicit medical evidence or findings on permanency are not required to support a scheduled-loss award under R.C. 4123.57(B).  Though, critically, the permanency of such condition cannot be conflated with the issue of whether an

amputation has functionally resulted in an injured worker's total loss of use of that body part, for all intents and purposes. As explained below, we believe the magistrate's analysis conflated case law regarding these two distinct concepts, which we find was error.

### 1. Scheduled-Loss Compensation Law

{¶ 31} R.C. 4123.57 governs partial disability compensation. R.C. 4123.57(B) sets forth a schedule for the payment of compensation at the statewide average weekly wage for the total loss of enumerated body parts. Pursuant to the compensation schedule set forth in R.C. 4123.57(B), a claimant will receive 150 weeks of compensation for the loss of—or loss of use of—a foot.

{¶ 32} For purposes of R.C. 4123.57(B), "loss" "includes amputation or severance as well as the loss of use of the affected body part that is both permanent and total, to the same effect and extent as if the body part had been physically removed." *Ottinger*, 2024-Ohio-1656 at ¶ 19, citing *State ex rel. Walker v. Indus. Comm.*, 58 Ohio St.2d 402, 403-04 (1979), citing *State ex rel. Gassmann v. Indus. Comm.*, 41 Ohio St.2d 64, 67 (1975). *See also State ex rel. Walters v. Indus. Comm.*, ____ Ohio St.3d ____, 2024-Ohio-552, ¶ 33.

{¶ 33} To qualify for compensation under R.C. 4123.57(B), "[a] claimant must demonstrate with medical evidence a total loss of use of the body part at issue 'for all practical intents and purposes.' " *Walters* at ¶ 33, quoting *Alcoa Bldg. Prods.*, 2004-Ohio-3166 at ¶ 12. In *Alcoa Bldg. Prods.*, the injured worker suffered an industrial injury to his left hand and arm that resulted in amputation of his left arm just above the elbow. *Id.* at ¶ 1. We upheld the commission's award for the loss of the left arm under R.C. 4123.57(B) based on evidence that the injured worker was unable to use that arm with a prosthesis, and the Supreme Court of Ohio affirmed our decision. *Id.* at ¶ 3-4, 16-17.

{¶ 34} Even if a body part retains some residual function, a claimant may still qualify for a total loss of use award under R.C. 4123.57(B). *Ottinger* at ¶ 19, citing *Alcoa Bldg. Prods.* at ¶ 13, and *State ex rel. Kroger Co. v. Johnson*, 128 Ohio St.3d 243, 2011-Ohio-530, ¶ 22. In other words, to support a total loss-of-use award under R.C. 4123.57(B), it is not necessary "that the injured body part be of absolutely no use for it to have lost its use for all practical purposes." *Ottinger* at ¶ 19, citing *Alcoa Bldg. Prods.* at ¶ 13, and *Johnson* at ¶ 22. "[T]he pivotal question is how much function remains." *Johnson* at ¶ 15.

### 2. The Commission Did Not Abuse Its Discretion in Awarding Scheduled-Loss Compensation to Mr. Bullard

{¶ 35} We begin our analysis by first observing an undisputed point: the amputations of Mr. Bullard's left foot are permanent. First, Mr. Bullard's first three toes were amputated. (Stip. Evid. at 10-11.) Then, Mr. Bullard's left foot was amputated at the Lisfranc level and subsequently sent "for pathologic disposal." (Stip. Evid. at 12.) After his Lisfranc amputation, portions of Mr. Bullard's fourth and fifth metatarsal bones were removed, and skin and subcutaneous tissue to muscle were debrided from his left foot. (*See* Stip. Evid. at 14-15, 24-28, 60-61, 67-70.)

{¶ 36} Nothing in the record before us suggests that any portion of Mr. Bullard's amputated left foot has been, can, or will be reattached. *Compare State ex rel. Welker v. Indus. Comm.*, 91 Ohio St.3d 98, 100 (2001) (commission denied scheduled-loss award under R.C. 4123.57(B) because amputated left thumb was successfully reattached and there was no evidence of a permanent and total loss of use of the digit). In other words, the broken bones, dead cells and tissue, and infected bones excised from Mr. Bullard's left foot over the course of now four amputation surgeries are gone forever. Suffice it to say, then, that, though not removed in total, the considerable amputations of Mr. Bullard's left foot are permanent. The permanency of an amputated body part that remains detached from the body is self-evident. It is likewise axiomatic that because body parts cannot regenerate—and absent successful reattachment—the condition of having lost a body part, in part or in full, due to amputation, will never improve.

{¶ 37} For these reasons, respondents' objections to the magistrate's evaluation of the permanency issue and reliance on *Block*, 2023-Ohio-4184, are well-taken. Indeed, because *Block* involved a fractured body part that was **not amputated**, it follows that evidence proving the injured worker's total and permanent loss of use of the right hand was required to sustain a scheduled-loss award under R.C. 4123.57(B). *See Block* at ¶ 15-23. But, given the permanency of the amputations to Mr. Bullard's left foot, *Block*'s analysis has minimal application here. As such, we reject the magistrate's finding that, under the facts and circumstances of this case, the commission abused its discretion in failing to explicitly state a self-evident principle in its May 2022 order: that amputation of a body part without evidence of the possibility of reattachment is a permanent condition.

{¶ 38} True, Mr. Bullard's left foot was not totally removed. Thus, the award of scheduled-loss compensation in this case ultimately turned on whether Mr. Bullard's functional loss of use of his left foot was total, for all practical intents and purposes, "to the same effect and extent as if the limb had been physically removed." *See Walters*, 2024-Ohio-552 at ¶ 33; *Alcoa Bldg. Prods.* at ¶ 12; *Ottinger* at ¶ 19. On review of the record before us, we find "some evidence" to support the commission's finding that, due to Mr. Bullard's permanent partial left foot amputations, he "has lost the use of his left foot for all practical intents and purposes" and thus was entitled to the loss-of-use award under R.C. 4123.57(B). (Stip. Evid. at 71.)

{¶ 39} In the May 26, 2022 order, the SHO explicitly delineated the evidence he relied on to grant Mr. Bullard's request for scheduled-loss compensation. In addition to generally considering Mr. Bullard's medical records and Dr. Louis's March 2, 2022 IME report, the SHO stated his findings were based on the March 15, 2022 opinion of Dr. Van Hoff that "[a] as a direct result of Mr. Bullard's L[i]sfranc amputation procedure * * * for all practical intents and purposes he has a total loss of use of his foot" (Stip. Evid. at 59); the medical reports of Mr. Bullard's treating providers; photographs depicting what remains of Mr. Bullard's foot; and Dr. Van Hoff's April 2022 treatment records indicating Mr. Bullard would be undergoing further amputation of his left foot—which occurred in September 2022—and noting Mr. Bullard was unable to use his prosthetic device (Stip. Evid. at 67-70). (*See* Stip. Evid. at 71-72.)

{¶ 40} Significantly, the Supreme Court of Ohio has held that "a doctor's opinion as to whether 'for all practical purposes' the claimant has lost all use of the affected member is critically important." *State ex rel. Varney v. Indus. Comm.*, 143 Ohio St.3d 181, 2014-Ohio-5510, ¶ 24, quoting *Johnson*, 2011-Ohio-530 at ¶ 17. Dr. Van Hoff's March 15, 2022 report clearly satisfies that standard. (*See* Stip. Evid. at 59.) And, on review, we find the evidence in the record before us supports his assessment. The SHO found Mr. Bullard's testimony that "he can not [sic] walk on his left foot and basically the only use he has of what remains of his left foot is to put weight on his left heal as he transfers onto his scooter" to be "credible and persuasive" given photographic evidence depicting what remains of Mr. Bullard's left foot. (Stip. Evid. at 71-72.) Though neither party submitted a transcript of the hearing before the SHO, "there is a presumption of regularity that attaches to commission

proceedings, including proceedings before an SHO." *State ex rel. Stevens v. Indus. Comm.*, 10th Dist. No. 10AP-1147, 2012-Ohio-4408, ¶ 18 (Dorrian, J., concurring), citing *State ex rel. Keebler Co. v. Indus. Comm.*, 10th Dist. No. 11AP-267, 2012-Ohio-2402, ¶ 12.

{¶ 41} Since Randstad bears the burden of proving its entitlement to mandamus relief, it was obligated to correct any deficiencies in the record. *See Stevens* at ¶ 7-11. Because Randstad did not submit transcripts of the relevant proceedings in this case, neither the credibility of Mr. Bullard's hearing testimony nor the SHO's summation of that testimony can be questioned. As such, the magistrate erred in discounting the SHO's reliance on that testimony when analyzing the evidence supporting the commission's scheduled-loss award decision. (*See* Appended Mag.'s Decision at {¶ 88}.)

{¶ 42} Significantly, we observe nothing in the record before us to suggest Randstad offered any evidence or testimony at the May 23, 2022 SHO hearing refuting Dr. Van Hoff's opinion on the extent of Mr. Bullard's functional loss of use or Mr. Bullard's factual testimony supporting that opinion. Rather, Randstad's evidence concerning the loss of functional use issue was submitted in the form of an addendum report prepared by Randstad's IME expert, Dr. Louis, on June 10, 2022 and submitted to the commission *after* the SHO's May 26, 2022 order that is the subject of this case was issued. But, the fact that Dr. Louis held a different opinion on the extent of Mr. Bullard's functional loss of use from Dr. Van Hoff does not render the commission's decision to grant scheduled-loss compensation under R.C. 4123.57(B) an abuse of discretion under the facts and circumstances of this case.

{¶ 43} Notwithstanding the fact that Dr. Louis's addendum report was not before the SHO at the second hearing in May 2022, we do not believe the commission's consideration of Dr. Louis's addendum report—at a third hearing or otherwise—would warrant a different outcome under the facts and circumstances presented in this case. This is because Dr. Louis's addendum report does not make a *specific* functional loss-of-use finding as to Mr. Bullard, but, rather, contains *general* statements about the functional ability expected after a typical Lisfranc amputation. (*See* Stip. Evid. at 74-75.)

{¶ 44} In his addendum report, Dr. Louis explains that "[a] Lisfranc procedure is an amputation performed to preserve function, not to remove the damaged part alone." (Stip. Evid. at 75.) He further notes a "Lisfranc amputation also implicitly contains a

reconstruction, which allows the foot to be used with a support in the shoe to facilitate gait."
(Stip. Evid. at 75.) But Dr. Louis's addendum report is silent on how (or how not) the
additional debridement surgery performed on October 25, 2021—after the October 19, 2021
Lisfranc amputation—bears on his general statement about the functional ability expected
after a typical Lisfranc amputation. Also absent from Dr. Louis's addendum report is any
finding as to whether what remains of Mr. Bullard's left foot could be used with a support
in the shoe to facilitate gait. Indeed, Dr. Louis makes no reference to Mr. Bullard's inability
to wear a prosthetic device in his addendum report. (*Compare* Randstad Objs. at 5.) Nor
does Dr. Louis's addendum report address the impact, if any, Mr. Bullard's impending
fourth surgery involving the excision of his fifth metatarsal bone—as described in Dr. Van
Hoff's April 2022 record and referenced in the May 26, 2022 SHO order analyzing Mr.
Bullard's functional loss-of-use theory—might have on his opinion.

{¶ 45} True, Dr. Louis's addendum report referenced his March 2, 2022 findings
that Mr. Bullard had, at least at that time, dorsiflexion (the action of raising the toes and
foot upward toward the shin) and plantar flexion (the action of bending toes and foot
downward away from the body) power. (*Compare* Randstad Objs. at 5.) But even assuming
those findings remained unchanged on June 10, 2022, they do not negate Mr. Bullard's
testimony that he cannot walk on his left foot, which the SHO found to be "credible and
persuasive" based on his review of the March 15, 2022 photographs of Mr. Bullard's left
foot and the records from Mr. Bullard's treating providers. (*See* Stip. Evid. at 71-72.) And,
most critically, Dr. Louis's addendum report did not opine on whether Mr. Bullard actually
had the ability to walk or perform any function beyond assisting with the transfer to his
scooter or whether Mr. Bullard's perceived residual dorsiflexion and plantar flexion permits
Mr. Bullard to bear weight for any appreciable duration or walk on his foot. (*Compare*
Randstad Objs. at 5-6.)

{¶ 46} Further, Dr. Louis's addendum report did not specify any prosthetic device
he knew Mr. Bullard to be using or contain any findings on whether Mr. Bullard could use
a prosthesis to ambulate or stand. Because Dr. Louis's addendum report did not answer
the ultimate question of whether Mr. Bullard can stand or walk with a prosthesis, it did not
rebut Mr. Bullard's evidence—and the SHO's finding—that Mr. Bullard suffered the
permanent loss of use of his left foot for all intents and purposes.

{¶ 47} In any event, we recognize that a significant distinction exists between a prosthetic device and surgical restoration. *See, e.g., Welker*, 91 Ohio St.3d at 100-01, quoting *Fogarty v. Rhode Island*, 103 R.I. 228, 231 (1967) (" 'Live tissue * * * is not equatable with a prosthetic device purchased from a surgical appliance dealer. One is real; the other artificial.' "). Unlike reattachment or surgical restoration of a body part, prosthetic devices are not permanent and must regularly be taken off and put back on. In addition to serving as constant reminders of the amputated or damaged body part, prosthetic devices can be lost, misplaced, damaged, or require maintenance, causing the wearer to again suffer loss of functional use in the interim.

{¶ 48} Indeed, in *State ex rel. GE Corp. v. Indus. Comm.*, 103 Ohio St.3d 420, 2004-Ohio-5585, the Supreme Court recognized the difference between the implantation of an artificial device and surgical restoration for purposes of making an award under R.C. 4123.57(B). *See id.* (intraocular plastic lens is corrective and, therefore, could not be considered in making benefits award for lost eyesight). Along that same line, other state courts have held that artificial implants do not constitute a total replacement that bars an injured worker from receiving loss-of-use benefits. *See, e.g., Tew v. Hillsdale Tool & Mfg. Co.*, 142 Mich.App. 29, 37-38 (1985) (recognizing distinction between live tissue and artificial prosthetic device in concluding that prosthetic boot should not be considered when awarding plaintiff's benefits because it does not become part of the body); *Vitti v. Milford*, 336 Conn. 654, 667-69 (2020) (summarizing state court decisions discussing distinction between transplanted live tissue and a prosthetic device).

{¶ 49} However, in the absence of ***any*** evidence showing that Mr. Bullard can wear a prosthetic device that gives him functional use of his left foot, we need not determine whether the hypothetical use of an artificial device following amputation constitutes use of a body part for purposes of a loss-of-use claim under R.C. 4123.57(B) in this case.

{¶ 50} "[T]he commission has substantial leeway in both interpreting and drawing inferences from the evidence before it." *State ex rel. Lawson v. Mondie Forge*, 104 Ohio St.3d 39, 2004-Ohio-6086, ¶ 34. Here, that leeway permitted the commission to conclude that the evidence before it showed Mr. Bullard "has lost the use of his left foot for all practical intents and purposes" due to ***permanent*** amputations caused by an industrial injury. (*See* Stip. Evid. at 71-72.) In the May 26, 2022 SHO order, the commission

identified the medical evidence it relied on and explained its reasoning for finding that, due to the permanent partial amputation of Mr. Bullard's left foot, he has lost, for all intents and purposes, the functional use of what remains of that foot. *See Alcoa Bldg. Prods.*, 2004-Ohio-3166 at ¶ 13-14; *Varney*, 2014-Ohio-5510 at ¶ 24.

{¶ 51} Although Randstad twice contends in its briefs that the medical records discuss Mr. Bullard "walking and moving around" (Randstad Reply to Objs. at 3; Randstad Objs. at 6), Randstad does not cite to any portions of the record supporting a finding that Mr. Bullard could bear weight on his left foot for any appreciable period beyond when transferring to his scooter. Nor, on review, do we find that it does. Again, the burden was on Randstad, as the relator, to demonstrate both its clear legal right to mandamus relief and the abuse of discretion on the part of the commission. *See Block*, 2023-Ohio-4184 at ¶ 11.

{¶ 52} Based on the foregoing, we disagree with Randstad's contention that the record before us lacks some evidence to support the commission's functional loss-of-use finding. Because we find the commission's order is supported by some evidence, we conclude the commission did not abuse its discretion in awarding Mr. Bullard scheduled-loss compensation under R.C. 4123.57(B). *See Mobley*, 78 Ohio St.3d at 584 (an order based on some evidence will not be disturbed as manifesting an abuse of discretion).

{¶ 53} For these reasons, we sustain the commission's second objection to the magistrate's decision; sustain both of Mr. Bullard's objections; and overrule Randstad's first objection. And, having addressed several of the arguments related to Randstad's second objection, that objection is likewise overruled, as further explained below.

### C. Review of Magistrate's Failure to Address Randstad's Remaining Arguments

{¶ 54} In its second objection to the magistrate's decision, Randstad argues the magistrate erred in failing to address additional arguments raised in support of its petition for mandamus relief. Initially, we note the magistrate explicitly identified these additional arguments but ultimately concluded that many were interrelated and generally pertained to the sufficiency of the evidence concerning either the SHO's permanency or loss-of-use findings. (Appended Mag.'s Decision at {¶ 85}.) Randstad does not object to the magistrate's grouping of its arguments but, rather, takes issue with the magistrate's failure to address each specific contention after finding its argument regarding permanency was

dispositive of the mandamus action. Because we do not find those additional arguments compelling—several of which have already been addressed above—we find no error in the magistrate's failure to address them.

{¶ 55} Randstad states that because "[Mr. Bullard] continues to treat and was being fitted for his prosthesis when the award was made," this clearly shows improvement "was not only possible but was expected." (Randstad Objs. at 4.) That claim is not supported by the record. Evidence showed the BWC approved Mr. Bullard for a prosthetic device in January 2022. (Stip. Evid. at 39.) However, Dr. Van Hoff's April 5, 2022 record indicates that, at least by that date, Mr. Bullard had received his prosthetic device but could not wear it because of pain he was experiencing at the fifth metatarsal bone. (Stip. Evid. at 68.) Dr. Van Hoff's April 2022 record further indicates that, given this issue, additional surgery— an excision of his fifth metatarsal bone and a rerouting of his peroneal tendon—was likely. (Stip. Evid. at 68.) While this evidence postdated the DHO's March 25, 2022 order, it clearly preceded the May 26, 2022 SHO order that is the subject of this mandamus action. Nothing in the record before us suggests Mr. Bullard wears a prosthetic device today. As such, this argument is not well-taken.

{¶ 56} Randstad also contends it was error to deny a third administrative hearing after it submitted Dr. Louis's June 10, 2022 addendum report specifically addressing the loss of use issue. (Randstad Objs. at 4-5.) Essentially, Randstad posits that Dr. Louis's initial March 2, 2022 IME report did not address Mr. Bullard's functional loss of use theory because that theory was first presented at the March 16, 2022 hearing before the DHO. (Randstad Objs. at 5. *See* Stip. Evid. at 62; Appended Mag.'s Decision at {¶ 66}.) But, at the time of that hearing, Randstad and Dr. Louis knew Mr. Bullard's left foot was not fully amputated. Given well-established case law holding that a claimant may be entitled to scheduled-loss compensation under R.C. 4123.57(B) for either physical loss or functional loss of use of a limb, it is difficult to understand why, given the facts of this case, Randstad would not have anticipated Mr. Bullard advancing such a theory.

{¶ 57} In any event, we note that Dr. Van Hoff's March 15, 2022 causation statement clearly indicated Mr. Bullard's intent to seek recovery under a functional loss-of-use theory. (*See* Stip. Evid. at 59.) And the March 25, 2022 DHO order clearly based its scheduled-loss award on its acceptance of Mr. Bullard's functional loss-of-use theory. (*See* Stip. Evid. at

62-63.) Yet, inexplicably, Dr. Louis did not prepare the addendum report on which Randstad's argument for a third hearing relies until June 10, 2022—well after the May 23, 2022 hearing before the SHO. Randstad offers no explanation as to why it failed to submit any evidence challenging the propriety of Mr. Bullard's functional loss-of-use theory in anticipation of the May 2022 hearing. And, because that hearing transcript is not in the record before us, we cannot say what evidence—other than that described in the May 26, 2022 SHO order—was before the commission at that time. Suffice it to say, however, that the commission is not obligated to conduct a third hearing due to Randstad's belated submission of rebutting medical evidence. *See State ex rel. Owens-Illinois, Inc. v. Indus. Comm.*, 61 Ohio St.3d 456 (1991) (where employer was given ten weeks to submit rebuttal report but failed to do so, commission did not err in denying employer's request for a third oral hearing on new evidence). And, as already explained above, we do not believe the commission's consideration of Dr. Louis's addendum report at a third hearing would have warranted a different outcome, contrary to Randstad's arguments otherwise. As such, we disagree with Randstad's overarching contention that Dr. Louis's theoretical and untimely opinion warranted a third administrative hearing.

**{¶ 58}** Finally, we turn to Randstad's contention that because Mr. Bullard "was collecting temporary total disability," this "negates a permanency award for permanent loss of use" since Mr. Bullard "had not been declared MMI [maximum medical improvement], by definition meaning there was no room for improvement." (Emphasis sic.) (Randstad Objs. at 4.) This argument is likewise not compelling. Randstad does not cite to any authority supporting this contention. Nor does R.C. 4123.57(B) contain any statements precluding a person receiving TTD compensation from receiving a scheduled-loss award. We further note that because Randstad agreed to Mr. Bullard's entitlement to TTD compensation at the February 2, 2022 hearing, the DHO dismissed that application as moot on the agreement of the parties. (Stip. Evid. at 109-10.) To the extent Randstad believes the commission's subsequent orders granting scheduled-loss compensation to Mr. Bullard have any bearing on the propriety of the February 5, 2022 DHO order or Randstad's obligation to pay TTD compensation, those concerns should be addressed by the commission, in the first instance, through administrative proceedings.

## IV. DISPOSITION

{¶ 59} After an examination of the magistrate's decision, an independent review of the record pursuant to Civ.R. 53, and due consideration of the parties' objections and arguments, we sustain the commission's and Mr. Bullard's objections to the magistrate's decision and overrule both of Randstad's objections. Accordingly, we modify the magistrate's findings of fact and conclusions of law for the reasons discussed above and deny the requested writ.

*Objections sustained in part, and overruled in part*;
*writ of mandamus denied.*

LUPER SCHUSTER and JAMISON, JJ., concur.

## APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Randstad North America Inc.,  :

      Relator,                                      :

v.                                                                       No.  22AP-688

                         :

Andrew J. Bullard et al.,                          (REGULAR CALENDAR)

      Respondents.                             :

                         :

---

MAGISTRATE'S DECISION

Rendered on April 25, 2024

---

*Lori Whitten Law LLC*, and *Lori A. Whitten*, for relator.

*Flint and Kilbride LLP,* and *Christopher A. Flint*, for respondent Andrew J. Bullard.

*Dave Yost*, Attorney General, and *John R. Smart*, for respondent Industrial Commission of Ohio.

---

IN MANDAMUS

{¶ 60} Relator, Randstad North America Inc. ("employer"), has filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order that granted claimant's request for compensation for permanent total functional loss of use, and to enter an order denying such compensation.

Findings of Fact:

{¶ 61} 1. Claimant was injured on September 24, 2021, in the course of and arising from his employment with the employer, a temporary employment agency, when he was ejected from the forklift he was operating at the premises of the employer's client, and the forklift crushed his left foot. After several complications and surgeries, claimant underwent a Lisfranc-level amputation of his left foot, retaining his heel and part of the forefoot. His workers' compensation claim was initially allowed for crush injury to the left foot and fractures toes left foot.

{¶ 62} 2. On October 6, 2021, claimant requested temporary total disability compensation ("TTD"). The employer agreed to payment of TTD compensation commencing September 25, 2021, and continuing.

{¶ 63} 3. On December 29, 2021, claimant filed a motion to allow the claim for left foot amputation, left foot crushing injury complication by infection, and degloving injury to the left forefoot. The motion also requested a scheduled-loss amputation award for the total loss of the foot.

{¶ 64} 4. On March 2, 2022, David Louis, M.D., performed an independent medical examination ("IME"). At the time, the only issue pending was an amputation award. In the report from the examination, Dr. Louis found the following, in pertinent part: (1) claimant does not have an amputation of the entire left foot but, instead, a Lisfranc amputation, which is a partial amputation at the level below the metatarsals; (2) claimant has not sustained a total loss of the left foot causing him to be eligible for an amputation award for the complete loss of the foot; (3) claimant still has dorsiflexion plantar flexion power of the remaining left foot; and (4) claimant does not have a complete loss of the left foot via amputation and, thus, does not qualify for an amputation award for total loss of the left foot.

{¶ 65} 5. In a March 15, 2022, statement, Corey VanHoff, M.D., indicated that, as a direct result of claimant's Lisfranc amputation procedure on October 25, 2021, for all practical intents and purposes, claimant has a total loss of use of his foot.

{¶ 66} 6. A hearing was held before a district hearing officer ("DHO") on claimant's December 29, 2021, motion. In its brief before this court, the employer asserts that, at the hearing, claimant informed the employer that he would be requesting both loss by

amputation and a total functional loss of use, and the commission has responded that it accepts this assertion as true although it has no knowledge of the amended request. In a March 25, 2022, order, the DHO found the following: (1) the claim is allowed for left foot Lisfranc amputation, left foot crushing injury complication by infection, and degloving injury to the left forefoot; (2) claimant's request for scheduled loss of use of the left foot is granted; (3) claimant has lost the use of his left foot to such a degree that the left foot is useless for all practical purposes and that his left foot, although partially present, is not capable of performing most of the functions that it commonly performs; (4) claimant is awarded compensation for loss of use of his left foot; and (5) the order is based on the September 24, 2021, October 19, 2021, and October 25, 2021, operative reports; the December 6, 2021, office notes of John Hegarty, C.N.P.; and the March 15, 2022, report of Dr. VanHoff. The employer appealed.

{¶ 67} 7. Claimant was examined by Dr. VanHoff on April 5, 2022, and in a report filed on April 13, 2022, Dr. VanHoff indicated that he discussed with claimant the option of excision of his fifth metatarsal bone and a rerouting of his peroneal tendon.

{¶ 68} 8. A hearing was held before a staff hearing officer ("SHO"), and on May 26, 2022, the SHO issued an order, in which the SHO found the following: (1) the claim is allowed for left foot Lisfranc amputation, left foot crushing injury complication by infection, and degloving injury to the left forefoot; (2) claimant's request for compensation for the total loss of use of the left foot is granted; (3) claimant has lost the use of his left foot for all practical intents and purposes; (4) the decision is based on the March 15, 2022, report of Dr. VanHoff, and claimant's testimony at hearing that he cannot walk on his left foot and basically the only use he has of what remains of his left foot is to put weight on his left heel as he transfers onto his scooter; (5) claimant's testimony is credible based on photographs filed March 15, 2022, showing what is remaining of claimant's left foot; (6) this is the type of bare minimum remaining "use" of an extremity, simply because the appendage is not totally gone, that the Supreme Court of Ohio ruled in *State ex rel. Alcoa Bldg. Prods. v. Indus. Comm.*, 102 Ohio St.3d 341, does not bar the payment of a loss of use award; and (7) in addition, according to Dr. VanHoff's April 13, 2022, treatment records, Dr. VanHoff is planning for claimant to undergo more surgery

to remove even more of claimant's left foot, specifically his fifth metatarsal bone. The employer appealed.

{¶ 69} 9. In a June 10, 2022, addendum report issued by Dr. Louis, Dr. Louis found the following: (1) claimant has not sustained a permanent total loss of use of the left foot from a functional standpoint; (2) a Lisfranc procedure is an amputation performed to preserve function, not to remove the damaged part alone, and implicitly contains a reconstruction, which allows the foot to be used with a support in the shoe to facilitate gait; (3) claimant still has dorsiflexion and plantar flexion power of the remaining left foot; and (4) thus, claimant still has function of the left foot and has not sustained a permanent total loss of use from a functional standpoint. The employer filed Dr. Louis's addendum report with its appeal of the SHO's order.

{¶ 70} 10. On June 15, 2022, the commission denied the employer's appeal. Claimant filed a request for reconsideration.

{¶ 71} 11. On August 10, 2022, the commission denied claimant's request for reconsideration.

{¶ 72} 12. On November 11, 2022, claimant filed a complaint for writ of mandamus, requesting that this court issue a writ of mandamus ordering the commission to vacate its order that granted claimant's request for payment for permanent total functional loss of use and to enter an order denying such compensation.

Conclusions of Law and Discussion:

{¶ 73} The magistrate recommends that this court grant, in part, the employer's request for a writ of mandamus.

{¶ 74} In order for this court to issue a writ of mandamus, a relator must ordinarily show a clear legal right to the relief sought, a clear legal duty on the part of the respondent to provide such relief, and the lack of an adequate remedy in the ordinary course of law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967).

{¶ 75} A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order that is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State*

*ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 76} R.C. 4123.57(B) authorizes scheduled compensation to a claimant for the total loss of a body part, such as the total loss of an arm or leg. "Loss" within the meaning of the statute includes not only amputation, but also the loss of use of the affected body part. *State ex rel. Wyrick v. Indus. Comm.*, 138 Ohio St.3d 465, 2014-Ohio-541, ¶ 10, citing *State ex rel. Moorehead v. Indus. Comm.*, 112 Ohio St.3d 27, 2006-Ohio-6364.

{¶ 77} To qualify for compensation under R.C. 4123.57(B), the loss of use need not be absolute if the claimant has "suffered the permanent loss of use of the injured bodily member for all practical intents and purposes." *Id.*, citing *State ex rel. Alcoa Bldg. Prods. v. Indus. Comm.*, 102 Ohio St.3d 341, 2004-Ohio-3166, ¶ 12. However, a claimant may qualify for a total loss of use award under R.C. 4123.57(B) even if the body part retains some residual function. *State ex rel. Varney v. Indus. Comm.*, 143 Ohio St.3d 181, 2014-Ohio-5510, ¶ 16, citing *Alcoa Bldg. Prods.* "[T]he pivotal question is how much function remains." *State ex rel. Kroger Co. v. Johnson*, 128 Ohio St.3d 243, 2011-Ohio-530, ¶ 15. In *Alcoa Bldg. Prods.*, the Supreme Court of Ohio noted that evidence indicated the claimant continued to use what remained of his impaired limb for some minor functions: pushing open a car door, and tucking paperwork between the upper arm and chest; however, these minor residual functions did not preclude a scheduled award. *Id.* at ¶ 6.

{¶ 78} An injured worker claiming loss of use under R.C. 4123.57(B) bears the burden of showing that the loss of use is complete and permanent. *State ex rel. Carter v. Indus. Comm.*, 10th Dist. No. 09AP-30, 2009-Ohio-5547.

{¶ 79} There is no statutory definition of "permanent" in Ohio's workers' compensation act, and the term has different meanings as applied to different forms of compensation. *State ex rel. Block v. Indus. Comm. of Ohio*, __Ohio St.3d__, 2023-Ohio-4184, ¶ 15, citing *State ex rel. DaimlerChrysler Corp. v. Indus. Comm.*, 121 Ohio St.3d 341, 2009-Ohio-1219, ¶ 19-20, citing *State ex rel. Advantage Tank Lines v. Indus. Comm.*, 107 Ohio St.3d 16, 2005-Ohio-5829, ¶ 8. For purposes of scheduled loss-of-use awards under R.C. 4123.57(B), " 'permanency' always represents a level *above* which a claimant's condition will never improve" and "also represents the level to which a

claimant's condition can improve, should the condition temporarily worsen." (Emphasis sic.) *Block* at ¶ 16, quoting *Advantage Tank Lines* at ¶ 9

{¶ 80} In the present case, the employer presents numerous arguments, which are summarized as follows. The employer first argues that the commission did not have some evidence to support its order and abused its discretion when it awarded a permanent total loss of the foot by relying solely on Dr. VanHoff's March 15, 2022, one-sentence statement that, for all practical intents and purposes, claimant has a total loss of use of his foot. The employer asserts that Dr. VanHoff does not state that the loss is permanent, and the statement is totally without the context of treatment history, status of treatment, success of prosthesis, prognosis, or rationale. The employer contends that Dr. VanHoff's ongoing treatment to improve functionality of the foot, continuing TTD compensation, and the short time that the claim was pending before the award, shows that the condition is not considered permanent at this point.

{¶ 81} The employer next argues that the commission abused its discretion when it granted a permanent total loss of functional use based upon claimant's testimony discussing the remaining function of his foot. The employer contends that there is no permanent total loss of the foot because he still has a portion of his left foot with dorsiflexion and plantarflexion power, as opined by Dr. Louis. The employer points out that claimant testified at the SHO hearing that he was able to put weight on his heel to transfer himself to his scooter; thus, his foot is useful for some practical purpose. The employer asserts that weight bearing is an integral part of standing and walking, no matter how limited, and demonstrates residual functioning.

{¶ 82} The employer also argues that the commission abused its discretion when it prematurely awarded a permanent total functional loss of the foot because claimant continues to treat and is working with a prosthesis designed to improve function of the foot. The employer points out that the Lisfranc amputation allows for the foot to be used with a support in the shoe to facilitate gait, and Dr. VanHoff is continuing with treatment with the goal of improving functionality, including the use of a prosthesis. The employer asserts that there is a conflict if Dr. VanHoff is continuing with treatment to improve functionality while, at the same time, opining that claimant has a permanent total loss of use. Furthermore, claimant contends that, although a permanency award was allowed

concurrently with the receipt of TTD compensation in *State ex rel. R.R. Donnelley & Sons Co. v. Indus. Comm.*, 10th Dist. No. 21AP-119, 2022-Ohio-4774, because the improvement from the additional care at issue was found to be so negligible that it would not preclude both receipt of TTD compensation and a loss of use award, in the present case, the ongoing and future treatment is designed to completely restore the main function of the foot, namely, walking and standing, so the receipt of temporary and permanent benefits is inconsistent here. The employer also argues that *Alcoa*, which was cited by the DHO and SHO, is inapposite to this case because, here, claimant was awarded loss of use less than six months from the date of injury, is still treating with a prosthesis, has not been found to have a permanent loss of use by any doctor, and the ongoing treatment is in its early stages, whereas in *Alcoa*, the claimant requested loss of use 16 years after the injury, treatments were exhausted, the use of a prosthesis was unsuccessful, and surgery had failed. Claimant contends the present case is more like *State ex rel. Tichy v. Indus. Comm.*, 10th Dist. No. 10AP-477, 2011-Ohio-2612, in which functional loss was denied because there was still some residual functionality of the foot and the worker was able to bear weight on the foot, even though treatment had failed.

{¶ 83} The employer also argues that the commission abused its discretion when it awarded compensation for permanent total functional loss of use because the DHO, SHO, and the March 15, 2022, statement of Dr. VanHoff do not state that the functional loss was permanent.

{¶ 84} Finally, the employer argues that the commission abused its discretion when it failed to grant a third hearing and/or reconsideration on the basis of new evidence in the form of Dr. Louis's June 10, 2022, addendum, which provided an opinion on functional loss of use. This addendum contained compelling new evidence explaining that a Lisfranc procedure is an amputation performed to preserve function, not to remove the damaged part alone, and implicitly contains a reconstruction, which allows the foot to be used with a support in the shoe to facilitate gait; thus, claimant still has function of the left foot and has not sustained a permanent total loss of use from a functional standpoint.

{¶ 85} Many of these arguments are interrelated and can be grouped into the following two general contentions: (1) Neither the DHO nor the SHO made a determination that claimant's loss of use was permanent, and no medical evidence in the

record concluded that the loss of use was permanent; and (2) there is not some evidence to support the loss-of-use finding. The magistrate will first address the argument regarding permanency, as it is dispositive of this mandamus action.

{¶ 86} There can be no dispute that neither the DHO nor the SHO made a determination that claimant's loss of use was permanent. Permanency is not mentioned in either order. Furthermore, there can be little dispute that none of the evidence cited and relied upon by the DHO and SHO in their orders renders an explicit opinion that claimant's loss of use was permanent. Neither the commission nor the employer points to any evidence in the record supporting a determination that claimant's loss of use was permanent.

{¶ 87} After a review of legal authority on this subject, the issue hinges on which of two alternative routes to take in analyzing the present circumstances. The Supreme Court's recent decision in *Block* is instructive. In *Block*, the commission denied the injured worker's request for a scheduled award for the loss of use of his right hand under R.C. 4123.57(B) based, in part, on the determination that the worker had not presented proof that the functional limitations in the use of his right hand were permanent. The Supreme Court affirmed this court's denial of the worker's writ of mandamus. Although the worker argued that there was medical evidence in the record that contradicted the commission's finding that he presented no proof of permanency, the court found that this evidence demonstrated only the extent of his physical limitations and rejected the worker's argument that a finding of permanency was supported by the amount of time that passed since his injury, during which time he underwent multiple surgeries and years of treatment. In doing so, the court found that, although evidence of permanency may be shown by inference, none of the medical reports submitted by the worker explicitly opined that his limitations had reached a level of permanency. The court noted that one doctor arguably addressed the permanency of the worker's loss of use when he stated there were no plans for surgical intervention, there was no foreseeable great change in the worker's function, there was a significant amount of effort and persistence by the medical parties as well as the patient before arriving at this point, further treatment was only for palliative reasons and to improve his level of function for activities of daily living and selfcare in the hopes to minimize or eliminate the need for narcotic pain medicine, and further

progressive strengthening would be of no value because none of the treatments had led to any increase in his grip strength. However, the court found, the commission has substantial leeway in both interpreting and drawing inferences from the evidence before it, and, in this case, that leeway permitted the commission to conclude that the doctor's report was not evidence of a permanent loss of use—i.e., that the report did not offer proof that the condition had reached a level above which it will never improve. Thus, the court concluded, the commission did not abuse its discretion in finding that the worker had failed to present proof of a permanent loss of the use of his right hand.

{¶ 88} *Block* provides two principals that could be applied to the analysis of the present case: (1) permanency may be shown by inference; and (2) the commission has substantial leeway in both interpreting and drawing inferences from the evidence before it. Thus, applying these two principles in a vacuum, the employer's present argument regarding permanency could be analyzed by finding the commission's substantial leeway permitted it to infer from the medical evidence, photographs, and claimant's testimony that the loss of use of his left foot was evidence of a permanent loss of use. However, this analysis would be superficial and not consistent with how the Supreme Court analyzed the circumstances in *Block*. In *Block*, the court acknowledged that the commission can infer permanency; however, it then went on to conclude that none of the medical reports submitted by the worker explicitly opined that his limitations had reached a level of permanency. The same is true here: There are no medical reports explicitly opining that claimant's loss of use was permanent at this time. The court in *Block* acknowledged that there were medical reports from one doctor that arguably supported permanency of the worker's loss of use, but it found the commission's leeway permitted the commission to conclude that the doctor's report was not evidence of a permanent loss of use. In the present case, unlike *Block*, there is no medical evidence of the type in *Block* that was cited by the commission in either the SHO's or DHO's orders or the briefing before this court to find some evidence of permanency "arguably" existed. Furthermore, the parties here have not submitted a transcript of the hearings before the SHO and DHO, so this court has no way of determining whether claimant's testimony provided some evidence to support a finding of permanency. Although the magistrate acknowledges the substantial leeway that the commission has in interpreting evidence and drawing inferences therefrom, in the present case, there is simply no way to know whether the commission

interpreted or drew inferences from certain evidence because neither the DHO nor SHO made any mention of permanency, and the commission did not endeavor in mandamus to point to any evidence in the record that would provide some evidence to support an inference of permanency. For the magistrate to assume there existed evidence from which the commission inferred permanency, and to assume that the commission even considered the issue of permanency, is inconsistent with an injured worker's burden to show that the loss of use under R.C. 4123.57(B) is permanent. *See Carter*. For these reasons, the magistrate finds the commission abused its discretion when it did not adequately cite to the evidence it relied upon or adequately explain why it apparently believed claimant's loss of use was permanent, which is required for a loss-of-use award under R.C. 4123.57(B).

{¶ 89}  The Supreme Court has repeatedly held that "[i]n an order granting or denying benefits to a claimant, the commission must 'specifically state what evidence has been relied upon, and briefly explain the reasoning for its decision.' " *State ex rel. Merritt v. Indus. Comm.*, 161 Ohio St.3d 380, 2020-Ohio-4379, ¶ 3, quoting *State ex rel. Noll v. Indus. Comm.*, 57 Ohio St.3d 203 (1991), syllabus; and *State ex rel. Mitchell v. Robbins & Myers, Inc.*, 6 Ohio St.3d 481, 483-84 (1983) (the commission "must specifically state which evidence and only that evidence which has been relied upon to reach [its] conclusion, and a brief explanation stating why the claimant is or is not entitled to the benefits requested"). Where the commission fails to comply with *Noll*, the commission has abused its discretion. *Merritt* at ¶ 3, citing *State ex rel. Gemind v. Indus. Comm.*, 82 Ohio St.3d 457, 460 (1998). Therefore, in the present case, the magistrate concludes that the commission abused its discretion when it failed to specifically state what evidence it relied upon and explain its reasoning for its apparent conclusion that claimant's loss of use was permanent. Furthermore, because the issue of permanency is inextricably intertwined with the employer's remaining arguments related to loss of use, the matter must be returned to the commission for a determination on permanency before the employer's other arguments may be addressed.

{¶ 90}  Accordingly, it is the magistrate's decision that the employer is entitled to a limited writ of mandamus, and the commission must issue an order that cites what

evidence it relied upon in the record and briefly explain its reasoning for finding claimant's loss of use was permanent.

/S/ MAGISTRATE
THOMAS W. SCHOLL III

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the courts adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b). A party may file written objections to the magistrate's decision within fourteen days of the filing of the decision.